Michael WIEGAND, Appellant,

v.

Deborah WIEGAND, Respondent.

No. 64933.

Missouri Court of Appeals,
Eastern District,
Division One.

Oct. 4, 1994.

Michael J. McAvoy, Fenton, for appellant.

James J. Knappenberger, Shaw, Howlett & Knappenberger, Clayton, for respondent.

KAROHL, Judge.

Michael A. Wiegand, father, appeals from that portion of the decree of dissolution of his marriage to Deborah Kaye Wiegand, mother, which awarded mother primary custody of the parties' two minor children and ordered the family home sold. On appeal, father challenges the child custody award as being against the weight and sufficiency of the evidence. An issue regarding the disposition of the home has been settled and withdrawn. We affirm.

The parties were married on May 25, 1984, in St. Louis County. They had two daughters together—Catherine Louise Wiegand, born September 21, 1987, and Kellie Ann Wiegand, born January 23, 1989. The petition for dissolution of marriage of the parties was filed in the Circuit Court of the County of St. Louis on June 18, 1992. On September 21, 1992, the court entered an order on PDL motions awarding father custody of the minor children pendente lite. The case was tried and submitted on May 17, 1993, in Division No. 7 of the St. Louis County Circuit Court. On August 12, 1993, the court issued findings of facts, conclusions of law, and the decree of dissolution, in which it awarded primary physical custody of the mi-

nor children to mother and ordered the family home sold.

The evidence at trial revealed father was the elected Chief of Police of the City of Eureka and was living with the children at the family home at 303 Williams in Eureka. At the time of trial, the parties' arrangement was such that father took the children to mother's apartment on weekday mornings. Before she went to work, mother would take the older daughter to school and then take the younger daughter to the home of a babysitter, whom father had hired. For the summer months, father had arranged for his 84–year–old grandmother to move into the family home to care for the children, so that he could save child care fees. At trial, mother expressed concern that the grandmother would be exhausted after one day of watching the children and that some of her ideas about feeding the children would be detrimental to their welfare.

Father testified that on July 31, 1992, unbeknownst to his wife, he tape recorded a conversation with her about her request for $200. When he told her he did not have the money, she said that if he did not give her the money, she would charge him with rape. Later that day, she contacted the Eureka Police Department to discuss filing charges against her husband. She never followed through on this threat and she testified she never would have. Father admitted his wife had used some of her own earnings to take the family home out of foreclosure proceedings. Mother testified they had been experiencing financial difficulties in the months prior to the tape-recorded conversation. In addition, later in her testimony, mother revealed that her threat to charge criminal conduct was a reference to occasions when her husband was demanding in terms of sexual relations.

Mother denied having an affair before she and her husband separated. She testified she met a man in her capacity as a real estate agent. Later, this man became her boyfriend. Father testified that on one occasion, mother told father she had spent the night at her boyfriend's house with the children.

A neighbor, who was also an employee of father, testified she once saw one of the children standing alone at a street corner around noontime. She could not recall the date. She said there was no adult present with the child. Mother, however, testified that her daughter was waiting to catch a school bus and she was watching her from the living room window of their house. Another neighbor testified the children were left unattended at their home on occasion.

Father testified he wanted custody of the children, because mother angered easily and had slapped one of the daughters. Mother denied ever slapping the children or leaving them alone. She testified she wanted custody of the children because she felt she could be there more for the children than could her husband. In addition, she testified she felt the children had been involved in too many activities by their father and she wanted them to "slow down a little bit." Mother testified she wanted to have the house awarded to her to live in for approximately a year or two so she could fix it up for sale and then divide equally the net proceeds with father.

On appeal, father argues the trial court's judgment granting custody of the minor children to mother and that the family home be sold was clearly erroneous, because it was not supported by substantial evidence, was against the weight of the evidence, and was not in the best interest of the children. We first note the court must determine custody in accordance with the ultimate and sole test of the best interests of the child. Section 452.375.2 RSMo Cum.Supp.1993. The trial court has considerable discretion in awarding custody, and its judgment should not be disturbed unless the best interests of the child so demand. *D.K.L. v. L.C.L.*, 764 S.W.2d 664, 666 (Mo.App.1988). Reversal of the custody award is justified only if we have the firm conviction that the judgment was wrong, that the decree had no substantial evidence to support it, that it was against the weight of the evidence, or that it erroneously applied the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

Father cites *Kumsher v. Kumsher*, 763 S.W.2d 305 (Mo.App.1988), for the propo-

sition that a parent's grossly immoral conduct warrants denial of custody to that parent. *Id.* at 309. As evidence of mother's immoral conduct in this case, father points to mother's false accusations of rape against him, her "sexual promiscuity" to which the children were exposed by spending the night at the home of mother's boyfriend, and mother's allegedly having left children unattended.

There exists substantial evidence to rebut father's contention that mother's actions constitute "immoral conduct" that would justify or necessitate an order granting custody to father. Mother never filed a charge of rape against father, nor did she ever involve the children in such a threat. Father testified mother told him she and the children had spent the night at her boyfriend's home on *one* occasion. There was no evidence the children were exposed to anything rising to the level of "sexual promiscuity." In addition, even if mother's actions constituted sexual misconduct, this in and of itself is not sufficient to deprive a parent of custody, and the court must have evidence that the conduct has had or will have an adverse impact. *Massman v. Massman,* 784 S.W.2d 848, 849 (Mo.App.1990). There is no evidence of sexual misconduct, much less any evidence of an adverse impact on the children.

Father also cites *L.R.M. v. P.R.M.,* 780 S.W.2d 111 (Mo.App.1989), stating, "The facts in *L.R.M. v. P.R.M.* are parallel to the case at bar." However, the facts differ significantly between the two cases. In affirming the award of primary custody to the father, the court in *L.R.M. v. P.R.M.* stated, "There is substantial evidence in the record that mother engaged in extramarital affairs. She falsely accused father of sexually abusing their two children. She prompted the children with regard to the specific acts the children claimed father committed against them. She deliberately attempted to prejudice the minds of the children against father. She constantly interfered with father's visitation rights." *Id.* at 112. There is no comparable evidence that mother engaged in similar acts of misconduct. Although she admitted threatening to charge father with rape, she never did and the trial court was free to accept her explanation. These acts support a finding the marriage was broken but are insignificant on the custody dispute. She did not involve the children in the threat, unlike the mother in *L.R.M. v. P.R.M.,* who involved her children in claims of sexual abuse against their father. In sum, there was no evidence mother attempted to poison her children's minds against father. She spoke well of him as a father. There was no evidence mother had interfered with father's rights as primary custodian after the PDL order was issued.

The judgment is affirmed.

REINHARD, P.J., and CRAHAN, J., concur.